is Belleau v. Wall. So, um, Mr. Bresolano? Mr. Bresolano? May it please the court, good morning. The state of Wisconsin asked this court to reverse the district court. The state seeks to reduce the risk posed by a small subset of people, in this case, a repeat child sex offender who poses ongoing risks through the use of GPS tracking. The state does not believe the Constitution forbids that reasonable effort, and therefore asks this court to reverse on all grounds. I'll begin with the Fourth Amendment part of the case. As we know now from the U.S. v. Grady case, the question is, under the totality of circumstances, is what the state proposes to do reasonable? The nature of the search, the purpose, and expectations of the plaintiff. Wisconsin proposes that, in these circumstances at least, the tracking is reasonable. We're talking about, as I stated in my beginning, a subset of people. Mr. Belleau is a serious child sex offender. He was civilly committed because of a mental abnormality that predisposed him to do it again. Now, it's true that he no longer has a more likely than not chance of doing it again. He has no longer what I'm saying. A more likely than not chance of doing it, a 51% chance or more of doing it again. Who comes up with the odds? In Wisconsin, the civil commitment statute, you would need to show to a fact finder, a jury. No, no, who specifically comes up with these? I believe they're called forensic psychiatrists. They're PhDs in the area who use these measures and devices. Educated guesses is what you're saying. They're probabilities, Your Honor, yes. Based on sample sets. What do they base their probabilities? They're based on sample sets that correspond to the person they're looking at. So, people are called high risk sex offenders. I should be asking your opponent, I think, that question. He might also have an answer, Your Honor, yes. But, just to give a bit more of a picture. So, to go into civil commitment, you're evaluated, and one of these forensic psychologists or psychiatrists says, you're more likely than not, 51% or more, to do it again based on a mental abnormality, and do it again means reoffend sexually, molest another child. If a jury, a fact finder, a jury believes that, you go into civil commitment, you're subject to yearly reevaluations. Eventually, one of the plaintiffs, and I called him Mr. Ballew, but maybe that's the wrong pronunciation, the plaintiff's evaluator found that his chances of reoffending had dropped, meaning he no longer qualified to be in civil commitment. The evaluator found at that time he had about a 16% chance of reoffending upon release. When you say 16%, is that probability of being arrested for a future sex offense, or probability of committing it? Because most of these offenses are not actually, they're not actually detectable. Right, Your Honor, and I believe it would have to be re-arrest, otherwise there would be no way to, that would be the sample. So, how many people are usually fitting this profile, and checking off these boxes, and doing the analysis, how many people are re-arrested for another sex offense? Presumably that's just a fraction of the actual crimes they commit. I would assume so, Your Honor, yes. What percentage does it have to meet to be released from civil commitment? Once you drop below 50%, so you could be, theoretically, a 49% chance, probability that you're going to do it again, and you would be let out of civil commitment. And you would be in a similar situation as the plaintiff here. Wisconsin would, at that point, propose to GPS monitor that person. Is everybody who's let out of civil commitment required to have this GPS monitoring? That's correct, Your Honor. Everybody, yeah. Yes, and there are about 200 people in Wisconsin, the record reflects, that fit the mold. They're off their sentence. They're no longer on paper, on probation, or parole. And they're being GPS monitored in this sort of passive way, where we see where they go retrospectively. You don't have the monitor with you, do you? I don't, Your Honor. It's a standard monitor. Is it the same monitor that runners use? Yeah, I think maybe there's some pictures that the plaintiff has put in in the record. The measurement's about 1 1⁄2 by 2 1⁄2 by 3 1⁄2 inches. It's not as big as some of the other devices in the cases you'll read about in the past. The technology's gotten smaller, essentially. So you can cover it up with pants, but it's still there. But, I mean, is this a standard GPS monitor, or something special for Wisconsin, or what does that mean? Wisconsin uses a vendor, and I believe this is standard, issued from that vendor. Perhaps there are other vendors other states might use that have different devices. But it's not, as far as I know, specially designed just for Wisconsin yet. Since we're talking about the device, getting back to what this program does, the device has to stay on the plaintiff all the time, and Wisconsin, the Department of Corrections more specifically, receives a signal. What do you do if you take a shower? That's fine. It doesn't affect the device. In fact, you can bathe in it. I believe the device comes with a 15-feet range. It can go into water. So it doesn't prevent any of those things. And then it sends a signal back about once a minute. No one's looking at it when it comes back to the Department of Corrections. Usually every night someone looks to see, all right, was he tracked that day? Did it work? Usually it's just a static map. They'll see here are the points for the day. And there's a list of people, 200. So do they make a record of where the person was during the day? The map of the points is kept in a database. So it's out there. The vendor keeps the data. So if someone wanted to go back and see where Mr. Ballou was, yes. That's correct, Your Honor. The primary idea is that Wisconsin does not want this to happen again. So the idea is that if you know you're being tracked, that's going to reduce the chances of you doing it again. That's the hope. It's like your conscience. There's still a voice that tells you somebody's watching. Yes, Your Honor, right. As Your Honor suggested, some of these, I don't know how many, I guess no one knows, some of these are going to go undetected. But these people, these folks we know who are dangerous, are going to have it in their heads that I'm not going to be one of those people that can get away with it because they're going to be able to know where I was if they need to. So that's potentially a powerful deterrent. I don't think anyone argues that there's not a social need to deter a reoffensive child sex offense. It's a devastating crime. If it happens just one more time, then it has to happen. It's worth trying to reduce it. Wisconsin thinks, at least in this subset of people, this small subset, it's reasonable to do this tracking. We don't ask anything else of the plaintiff. We don't ask him to do things like you would do on probation or parole. We just want this tracking to take place so this deterrent effect happens. I gather a number of other states have done this. This is not unique to Wisconsin. That's correct, Your Honor. There are variations. I would say that most states have something like this, although I don't have the stat in front of me. The programs vary in little bits and pieces here and there, but there are quite a few states that have it, that have lifetime monitoring for the most serious sex offenders, which is how, in the Grady case, the issue first popped up in the Supreme Court level, saying, well, is this reasonable? Let's take a look at it. A few more points relevant to the Fourth Amendment issue. The case has asked, well, is this really a special situation? Why aren't you doing it the normal way with the warrant and probable cause, stuff like that? And we think this is a good example of a situation where you just can't. There's no way to use a probable cause warrant sort of framework to try to deter over a long period of time a dangerous sex offender who has a high risk to reoffend against children, because we don't think tomorrow you might do X in a certain place against a person Y. We just don't want them ever to do it. We want to deter that motivation. So the motivation, reducing motivation to reoffend, doesn't work with the whole idea of trying to say we need a warrant to do X. This program was enacted by the legislature of Wisconsin, I take it? That's correct, Your Honor, yes. They could, if I understand it correctly, have increased the penalty for the conviction if they chose. That's correct, Your Honor, yes. Going forward, yes. To increase the actual sentence, they could do that, yes, Your Honor. So had they chosen, they could have put life in prison, life in penitentiary for such offenses. Correct, Your Honor. I would posit that there's people out there who would support that approach. Are there people in the penitentiary in Wisconsin, if you know, who are serving life terms for child molestation? I would just be guessing, but I would assume yes, especially when we're talking about multiple offenders. I don't know offhand, though, Your Honor. I will mention one more topic on the Fourth Amendment, and since we are talking about a totality test, kind of everything gets thrown into the mix, potentially, and so I want to make sure all of our points are in here about the seriousness of the offense, the particular type of person we're looking at, and the fact that this is a problem that's hard to deal with in another way, to reduce the chances of reoffense. It's also the case that in this Court's decision, Greenaby Berg talked about DNA databases, and there is that secondary use of what we're dealing with here in having point locations of folks, that if something does happen, someone commits a new crime, this is a way to check to see, exclude or include people, say, okay, it's not this guy, or maybe it's this guy, so we can get them off the street or rule them out right away as a potential perpetrator. As this Court pointed out in Greenaby Berg, that's a special kind of situation. That's a special needs type of search. That is something that is not like in the U.S. v. Jones, U.S. Supreme Court case where you're going after a drug dealer. You think it's the guy. You're building a case against the guy. You want to catch him dealing drugs. That's not the kind of thing we're talking about here, so we think even though this is kind of new territory, there's no case on all fours that controls this decision. It fits the mold. Designed to inhibit his behavior pattern by his own acts, knowing he's being watched. Exactly, Your Honor. You can't prevent it. It won't prevent him committing another act. That's correct. Unless he does it because he's smart enough to figure out he's going to get caught. Sure, and we make no secret about the fact that he's being monitored and the data is kept, so we hope that he knows it's there, so it's going to be in his mind, and we hope that that's enough to make a difference, and there's some data out there that suggests it does make a difference. It's not in Wisconsin, but some other states have studied it. GPS monitoring high-risk sex offenders out on probation or parole, and they see a big drop in recidivism. I think almost half as many people did it again in a particular California study that we cite in the brief. There's a Florida study, a D.C. study. It seems to make a difference, and it's obviously rational that that would make a difference, knowing that you would potentially get caught or would get caught, really. It makes it almost certainty if you do it again under these circumstances. If this Court doesn't have further questions on that topic, I'll touch on the ex post facto issue before my time starts running out. The District Court found two reasons to invalidate Wisconsin's monitoring of the plaintiff. The second one was ex post facto, a retroactive punishment. We disagree with that ground as well, and we think there's a couple ways to pick at it, but maybe the most direct way, given our time today, is to go right to the crux of the District Court's decision, which was about the effect. We think the Court got it wrong when it decided that this was a punishment in disguise. The District Court agreed the legislature did not intend to punish folks like the plaintiff with this monitoring. As we've been discussing, it's meant to protect society going forward. It's meant to deter reoffense going forward in a difficult situation, a small subset of people. That's not a punishment. It might be a burden. Certainly the plaintiff doesn't want to wear it, but that doesn't make it a punishment. And I think if the Court goes through the five factors, that becomes apparent. And I see my white light is on, so if the Court has no further questions right now, I'll reserve my time. Okay, thank you, Mr. Rusanato. Thank you. Mr. Dupuis? Good morning. May it please the Court? I'd like to start out by correcting a few factual statements that were made by the defendants here. First of all, in terms of Mr. Ballou's risk of reoffense, the 16%, which was at the time of his release... No, no, that is not reoffense. That's being rearrested. No, it's actually reoffense. In his deposition, Dr. Elwood testified at pages 71 and 72 that he had made an upward adjustment from the raw percentages up to reoffense. So that was an adjustment to reflect reoffense. Wait, where does that come from? Because according to one study I saw, 80% of these sex crimes are never reported. So the person is never prosecuted. Yeah, he cites a study in a footnote to his, I believe, to his report about adjustments, and in his deposition he talks about, I believe, he talks about the study that was done by the same people who developed the Static 99, which is essentially looking at... the criminal gets away with because they're not reported. Yeah, I'm not entirely sure, but Dr. Elwood did make the adjustment upward. Well, how? What's the basis for it? My understanding is that they did a study with a smaller group of people. Well, how did they do the study? How do you do a study to find unreported crimes? I'm not sure, Your Honor. Okay. On another fact, the defendants suggest that the only use of this data, the data only goes into a database that's then never accessed unless there's some question about a possible crime that has been committed in a location, and they go and query the database. That's not actually how it operates. Every night a group of people in the monitoring center look over the maps of GPS, people on GPS, like Mr. Ballou, and they record where they've been. They look for things that they deem suspicious or of interest or not of interest. They've indicated when somebody has gone to a sporting event, when they go to church. Well, they know in a general way where he is. They do not know specifically what he's sporting about. Well, they know he's been at a... They've indicated when somebody's been at Lambeau Field. It seems unlikely that they would be at Lambeau Field, and they know the time and the day, so they can infer... They know he's in the vicinity of Lambeau Field at any rate. Well, more than the vicinity. These are incredibly accurate devices at this point. Pin it right down. Suppose he was at an elementary school playground. Yes, they can detect that as well. Well, I know, but that's exactly the sort of thing they want to know. Right, that's what they want to know. Well, there's nothing wrong with that, surely, because if he's hanging around kids, and then later, you know, there's a complaint by a parent or something, then they know to go after him. Recall that he has completed all of his sentences. What's wrong with that? It violates the Fourth Amendment. That's the conclusion. Look, we know that these sexophobes, these child molesters and so on, they're compulsive. They do this repeatedly. And so should there be an arrest, complaint, what have you, of course you want to know who among these sex offenders might have been there at that... or was there at the time of the incident. Casablanca had the word for it. Go pick up the usual suspects. Right, but the problem here is that this is an unprecedented level of intrusion onto somebody's life. The amount of information that is collected... You mean this specific case is unprecedented? Yeah, there's... There's nobody else in Wisconsin under this program? No, no, it's an unprecedented... This program is an unprecedented expansion that has not been reviewed by the Supreme Court. That's why Brady... What about Mr. Russomano's point, that if this is invalidated, these people aren't going to be any better off. You're going to have more civil commitment. You're going to have longer sentences. I'd rather wear one of these ankle bracelets and say I'm a runner than spend years in one of these kind of loony bins of civil commitment. But it's not an alternative to that. It's an alternative to prison. If it were an alternative to civil commitment... Why do you say it's an alternative to civil commitment? Why do you say it's not an alternative to civil commitment? Because he's not eligible for civil commitment. That's what the court has determined. Why is he eligible? Because he does not present sufficient risk. And there's absolutely nothing... Please, Juan, please. Yes. A study shows that we don't know how they arrived at this from the study because you can't answer the question. I assume you know this backward and forward. What do they use to determine how many people are arrested and how many are protected by this? How do they know what number to use, 16%, 20%, 15%? The basic number was 13% from actuarial tables. What do you mean actuarial? Who prepared the actuarial tables? There have been studies done by Helmut and all of these researchers who have done this work in Denmark, the U.S., Canada, and they have determined that there are certain characteristics that correlate to likelihood of reoffense. And if you have certain of these factors, then your odds are within this. Basically, what percentage of people with this set of characteristics are likely to reoffend? In Mr. Ballou's case, it was 13%. It would be to the government's interest to reduce the number of possibilities to zero. There's no doubt that the idea of trying to prevent this is a legitimate purpose. The problem is that there's absolutely no tailoring at all in this statute. You come out of civil commitment or you come out of a criminal sentence, and immediately this is put on you for the rest of your life. I don't understand what you're talking about. When you say that these psychiatrists find characteristics of people who reoffend, the only basis they have for determining whether someone has reoffended is if he's been arrested. So these figures are figures about re-arrest. They're not about recidivism. Again, the basic figure, the 13% figure, is about re-arrest. Using the static 99 tables, it gives you the figure for re-arrest. Dr. Ellwood used those figures, and then using a Bayesian approach, he accentuated it. Look, it doesn't make any sense because he doesn't know anything about people who have reoffended and have not been re-arrested. There have been studies done. I am not familiar with how those studies worked, but those studies took a look at likely other offenses that are not reported. And, again, I can't say exactly how those studies were done, but they were done, and that led to a 25% increase in the estimated risk for belief. I'd also like to say that the Fourth Amendment issue in this case can't be decided without looking at the Ferguson decision, which the defendants didn't cite, didn't try to address. Ferguson says that the deterrent effect alone of a program is insufficient to insulate it from a Fourth Amendment challenge. Ferguson also says that the program has to have a principle purpose other than crime fighting, and in this case, and also that it can't just give the evidence to the police. Other than crime fighting? I don't understand. Why isn't that an adequate purpose? Pardon me? Why isn't crime fighting an adequate purpose? Because under the Fourth Amendment, you'd require a warrant if you're trying to fight crime. No, you don't. That's the special needs exception. Why do you require a warrant to fight crime? That's absurd. Well, that's the Ferguson... When police are called to the scene of a violent activity and arrest people, they don't have warrants. Right, unless it falls within an exception, and there are a number of exceptions, including... Well, the question is, should there be an exception for these sex offenders because they are so prone to recidivate? And after all, all that's being done here is to provide a map of where people are so that if there is an incident, a place where they were at the time of the incident, then investigation will focus on that person. I don't see what's wrong with that. Under Ferguson, that would be similar... In Ferguson, the Charleston Hospital... You tell me what's wrong with it rather than citing a case. I think what's wrong with it is that ultimately it's an intrusion on privacy. What's an intrusion? So there's a map somewhere showing... Would you care if there was a map in some government office that shows where you are? Yes, I would. And why is that? Because... Are you chasing girls or something, or what? No, let's say I have ambitions to be a politician in the future. And I don't. I work for the ACLU, so that's pretty much down the tubes. But let's say I had ambitions to be a politician. There's a recidivist right in that group. Right. Or let's say I didn't have ambitions initially, but I go to a John Birch Society meeting. And as we know, opposition research is very intensive. And, you know, if this information is available, it could be used against me. There's nothing wrong with going to a John Birch meeting. Anybody else at that place can notice your presence and remark on it. So that's not a particularly good analogy. In theory, but there's no evidence of it. And at the time, I'm a young man. But they're not publicizing this information. Pardon me? They're not publicizing this information. No, but it's... They're using it if there's a sex incident somewhere. And the other thing is... So what's the problem with that? It identifies him as an offender, correct? Well, of course he is an offender. And he goes to a nursing home. And his mother, as the article on the BI website talks about, his mother at the nursing home says, I don't want you to come anymore because the residents, the staff at the nursing home keep asking, what is that on your ankle? I mean, this interferes with his associations with people. So he says it's a GPS monitoring device, which a lot of people wear who are not sex offenders. They're runners, or they might have some kind of condition which requires monitoring. You know, people who have various types of heart disease and so on, they have monitors that may be broadcast to a hospital to make sure that their heart rhythm is proper, right? Those monitors are not strapped on an ankle. A monitor that's strapped on an ankle is... Yeah, Mr. Boyd, wait a second. Technology being what it is, we're on our way to probably a bracelet or something similar to a watch. Wouldn't you think that's probably what's out there for the decade from today? Or possibly as the legislature actually contemplated in planting a chip. I mean, that's why they changed the statute to say comparable technology. Exactly. So the argument about the pant leg may fall away, you don't want to base it on that. No, it's not based entirely on that. And I suppose if you have just something similar to a wristwatch, it won't cause any attention. Right. Of course, if it's a true wristwatch, you can leave it behind. Yeah, no, I understand that. But if it's permanently attached. Yeah, but I want to talk to, as I think Judge Posner and Judge Bauer are speaking, sort of a broader question, and I assume that's why the ACLU is interested in the civil liberties aspect of this case. Apart from this specific case, if we're to lessen incarceration generally, and that's a goal that seems to be of some national concern, considering the stats we have among Western countries, wouldn't a monitoring system, if not intrusive, that's why I started by saying perhaps we'll get to the point, maybe the chip, but certainly maybe a bracelet or a wristwatch, where we could reduce incarceration rates. Because we have recidivism in areas other than those that are sexual offenders. And wouldn't that be a policy that the union would be supportive of? In other words, if you cut sentences by a half or two-thirds, think of a 30-year drug sentence, wouldn't we be in a better position in a broader sense of civil liberties if we had ex-felons monitored this way? Aside from cost. Absolutely, if it's actually an alternative to a sentence that's chosen at the time of the sentence. Well, don't you think legislatures would be pointing in the direction, with the incarceration costs, won't we be pointing in the direction of this? Yes, and I think that as an alternative to a criminal sentence of incarceration, this would be beneficial. It doesn't have to be an alternative to a sentence, but it can shorten the sentence by providing... Sure. I mean, it's part of the balance of determining what the sentence should be. What is the mix of incarceration versus... Yeah, and when you focus on this particular aspect of criminal activity, which has such a persistent evidence of recidivism, isn't this the area where you would want to focus on seeking to find something other than locking someone up in a mental institution or a prison? If it were part of a sentence or if it were an alternative to civil commitment at the time, yes, but that's not what's happening here. What's happened is there was originally a sentence given in which this was not an option. This lifetime GPS was not an option at the time that the sentencing judge sentenced him. Had it been, he might have gotten a shorter sentence. Instead, now, 25 years... more than 25 years after he commits his offense, the legislature imposes an additional... essentially an extension of his supervision beyond the time that his sentence called for. Well, I don't want to assume why you took the case but you didn't take the case just for the facts of this case. You took it to establish a much broader principle, right? Or do you want to limit the holding to just this case? Actually, we took the case because we were asked to take the case by the district judge. But nonetheless, yes, I think it does present important questions. Obviously, the Supreme Court just considered... But you're turning Judge Flom's point on its head because he's saying that technology like this could lead to shorter sentences. You're saying, or you're implying, that if we invalidate this practice, there'll be higher sentences because the judge or the legislator... there'll no longer be the alternative of the monitoring. No, Your Honor, we're not saying that it could not be used as an alternative for a future sentence. It could. The problem is that Mr. Ballou has completed his sentence. But you have all this stuff about how embarrassing it is to wear this and people see it and they know he's a sex offender. Now you're saying it's fine as long as it's part of the sentence. Yes. I mean, criminals can be punished for things that they do with punishments that were available at the time that they committed their offenses. So it is indeed, I think, punitive to have this visible device. I mean, it may not last forever that that particular aspect of this scheme is problematic, but certainly the intrusion is there and it could be imposed prospectively. And I believe under the Fourth Amendment, the greater includes the lesser. If you could be put in the literal panopticon, you can be put in the... I admire the fact you take the case. I understand a psychiatrist testified in this case. I'm sorry?  The psychiatrist was the defendant's expert witness. And the psychiatrist was also the psychiatrist who evaluated Mr. Ballou and repeatedly. And in fact, if you look at the record, he was repeatedly determined not to be sufficiently at risk to be civilly committed under Chapter 980, but because there's this general fear. Hold on, because that's not my question. The question is, did the psychiatrist testify that if he were given the authority, he would take the ankle bracelet off of this guy? No. There was no question asked about whether... But we asked whether he thought it contributed to reductions in recidivism. He cited a study that was cited by the state as well, which is probably the leading study as a National Institute of Justice study done in California. But that was a study of very different people. It said that there was a reduction in reoffense. And it was a fairly substantial reduction in reoffense. But it was for people who are very different from Mr. Ballou. They were people who had static 99 scores of 4 or above. Mr. Ballou's static 99 score is 0. It was for people who were on probation and parole and were in only the first year of their probation and parole. Mr. Ballou has been out for five years. His risk, which was originally estimated at 16%, is now down to 8% because there's a linear reduction in risk with age that, again, Dr. Elwood testified to. And so, again, what I would say is... Could Wisconsin say that a mandatory condition of supervised release in all sex offenses is lifetime monitoring? Going forward? Yeah. Yes.  I don't understand. Well, I mean, for any sex offense? Pardon? For any sex offense? Child molestation. I mean, I think there would have to be... I mean, as this Court's recent cases on conditions of extended supervision, I mean, there has to be some rational... No, no, no. ...individualized... No, no. I'm talking about mandatory supervised release. Our cases are about the optional supervised release. There the judge has to give reasons. Once mandatory, like can't own a gun and so forth, then the judge has no discretion. That's why I'm suggesting Wisconsin could buy, which has supervised release, it could have a mandatory term for sex offenders or sex child molesters, no lifetime monitoring with their ankle brace. Yes, going forward as a sentence for a crime that is committed after... I would disagree for Mr. Bellew. A few people escape, like under your view, Mr. Bellow, but then the legislature cracks down, and never again is anybody, are any of these people ever allowed to shake off the bracelet. I mean, that would be an unfortunate consequence if that's what happened. Why would it be unfortunate? Because I think this is really a breath... This is a what? It's a breathtaking expansion of... Breathtaking what? As the court in Jones said in a footnote, the GPS monitoring of a car is like having a constable in the boot of the car. Actually, it's not a car. I think they were talking about a coach from the 18th century. This is like having a constable strapped to your ankle. But you say it's fine as long as it's done prospectively. So what's all this about the... If it's done prospectively as part of punishment? I mean, there may be an Eighth Amendment question about whether it would be excessive, but that's probably true. There's probably no... because there's no bite to the proportionality test in the Eighth Amendment, unless you're talking about punitive damages. But I think there's... That's a reality that could happen as a result of this. But I also think that legislatures going forward, that discretion isn't what we're talking about here. We're talking about the 200 or so, some proportion of the 200 people who have this imposed on them retrospectively after they have completed their sentences entirely. And this is an intrusion that's beyond any other intrusion that's been countenanced by the courts. And I think, again, just to go back, I think Ferguson is an essential case to look at, because unless... And in this case, it is clearly being used to detect crime. And that use takes it out of the doctrine, the warrant exception or exception to the general warrant requirement for special needs. This is not a special need. And Ferguson says that the fact that there's some deterrent purpose or effect and the idea is to deter people from using drugs during pregnancy is insufficient to take it out of the warrant requirement. That's absurd. Because if there's a high crime neighborhood and the police department assigns a lot of police officers there, that's a form of monitoring and will discourage criminal activity. And you're saying that in order to reassign policemen there, they have to have a warrant. No, monitoring is different. Having a police officer... You can monitor by look by standing next to the person, or you can monitor with these devices. Now, why do you draw a distinction? As the court in Riley talked about and the court in the majority of the justices in Jones talked about, there is the police... The simple economics of the situation mean that the police aren't going to be able to engage in dragnet surveillance of that sort. They can only engage in it in very limited circumstances. Once you have this technology that makes it cheap and easy, there's no longer any limiting principle to what the government can do. And so I'm not suggesting that they couldn't do that. But, again, look at Edmond, which is another supposed special needs case. There they did, in fact, target certain areas where they were stopping cars. They had a 9% hit rate on finding narcotics. And the court said, that's not a good search. You need probable cause. And they didn't actually talk about a warrant in that case, but it was suspicion. And they said, you can't do that. Even though you've set these roadblocks up in areas where there are high drug trafficking, the court said, that is just a general interest in crime control. That doesn't justify going outside of the warrant requirement. And here we're talking about intrusion. Well, there are situations where roadblocks are allowed. Yes, there are. But they're very narrow. Well, these sex offenders do have a high recidivism rate. Okay, well, thank you very much, Mr. Dupuis. Mr. Russomano, do you have anything further? Thank you. I do have just a few points I'd like to make in response. Since opposing counsel brought up the Ferguson case, I think the court already identified some differences, and I'll just point out one more. This is the Ferguson v. City of Charleston case. The court talks about the program there, quote, Its initial and continuing focus of the policy was on the arrest and prosecution of drug-abusing mothers. The initial and continuing focus of the policy was on arrest. That's not what we're talking about here with the monitoring, as we discussed. We're talking about no law enforcement involvement initially because we don't want him to do it again. We're trying to stop it from happening again. It's a much different idea. And so I would point to the court, if the court were to look at Ferguson, at 82 and also at 83, there are some statements showing how that program was a much different idea. This is a point on ex post facto, I suppose, just to make clear that opposing counsel discussed this as a continuation of supervision in the sense of extended release or probation. As we discussed in the briefs, it really isn't. It's supervision in a layperson's term. There's a tracking. But that's it. The plaintiff isn't required to report in, hold jobs, not do things, do things, be at home, anything like that. Perhaps if there were this other scheme that was hypothesized of a lifetime supervision, we would have a situation where you have a lifetime probation officer, but our program is not that. It's just the tracking. I suppose the final point I'd like to leave the court with is this discussion of what the percentages mean. Whatever they mean, they're significant, in part because it's an 8%, 16%, whatever percent chance. That's still a pretty big chance when we're talking about sexual assault of a child. This is a big deal. It can ruin lives. Three percent would be a big one. I agree, Your Honor. Yes. This isn't property crime we're talking about. This isn't bank robbery even. This is child sexual assault. No drugs. Right, Your Honor. Wisconsin's not talking about monitoring those types of people. This is a very small subset of people. Wisconsin may someday talk about other types of people. If you've got somebody who's been convicted, let's say, three times for a felony, you don't think the legislature might consider a program similar to this? Because the stats on recidivism of a certain percentage of people who commit multiple felonies is high? Your Honor, I hate to speak for the legislature in the abstract, but no. As far as I know, there's no interest in that. The interest is in keeping this controlled and small and focused on this particular concerning subset of folks who we know are prone to do it again and who have a condition that pushes them in that direction. So for the reasons I've discussed and in the briefing, we would ask this court to reverse the district court. Thank you. Okay. Well, thank you very much. And thank you also to both of you for very good oral arguments. And the case will be taken under advisement.